Page numbers 13-2612 and 13-2612 United States of America v. Hussein Nazzal and 13-2628 United States of America v. Edward Schneider Arguments are not to exceed 10 minutes for each defendant and 20 minutes for the plaintiff Good morning, if I may reserve three minutes. Good morning, may it please the court, Arthur Weiss on behalf of the defendant Appellant Hussein Nazzal who appeals his convictions and sentence after a trial by jury before the Honorable David Lawson in the United States District Court for the Eastern District of Michigan. We have presented to the court seven and ask the court to consider them but for the brevity of time if I may direct my arguments to argument one and argument five. Argument one deals with whether or not Mr. Nazzal was tried before an impartial jury. There's a sixth amendment right to a fair and impartial jury if there is bias there is that the constitutional right is breached and at times may be implied by during the course of the trial a note was apparently issued complaining that the prosecution was working with or for the defense in the presentation of some of its exhibits. Okay and and with respect to that issue I know you argued that didn't the judge give a clarifying a curative instruction to address the issue that was the the bias issue that you all allege occurred? The court after it appears to be an in chambers conference with counsel did give such an instruction to the jury. The problem is at this juncture we don't know what caused that the jury to issue that note and whether in fact there was deep-seated bias and whether or not the instruction given by Judge Lawson cured or remedied that because there was never a dialogue or between the court and the request for a mistrial at that point? No there was not and the problem is from a defense perspective is is that we are dealing with potentially a structural error and there would be no legitimate basis for a strategic decision. Although the government cites the Perry case, Perry is substantially different. In Perry there was it's variously described as a shoulder bag or a book bag or a backpack that apparently was given to the jury as an exhibit and then there were some papers in that bag. The jury sent out a note about the papers, the book and the papers were retrieved, apparently the papers and everything was examined in chambers off the record and defense counsel then proposed an instruction to give the jury to deal with that. Here we don't know what precipitated that note. We don't know what bias existed in one or more of the jurors that they found offensive in the government helping out the defense and therefore unlike Perry, we don't know and that's why it begs that a REMER hearing should have been conducted sui sponte by the court and this court has previously indicated that the duty resides with the trial judge to conduct the hearing and unlike Perry where they least knew what was presented to the court or to the jury rather, here we have nothing at all and that's why it was more egregious and that's why the court respectfully should follow its precedent and mandate that the court conduct a REMER type hearing to determine the bias of the jury, what presented or caused them to issue the particular note and to see whether or not it was rectified by a cautionary instruction. Then it's further exacerbated by a couple of days later indicating that we have questions regarding legal terms of law and when that will be explained to us. These weren't notes from the jury as an entity were they? Weren't both of these notes from individual jurors? It's unclear because I was not trial counsel and though I looked on the record, I could not find that the particular notes were filed as a matter of record. So we're simply going on the basis of whether or not they were direct quotes, whether or not they are paraphrasing and there's no way to know from the cold record exactly what was given and whether or not... Except from the judge's response that Warren has a question. That's true, but are we dealing with the I in terms of I am a juror, am I speaking solely for myself or am I speaking for all 12 or 16 at that time of my colleagues? Again, because there's no dialogue and there's nothing to ask the jury to respond whether they're satisfied, whether this deals with it, simply giving a naked instruction without any response at all from the jury begs the question and then contributes to the fact that causes at least from my client's perspective that the jury was biased against him and had already started deliberations and had reached a point where it needed to know... Assuming all these things, speculating. That's the problem of not having a REMER hearing and the court not following its obligation. The problem is this court has previously ruled that it is not an appropriate strategic decision by defense counsel to waive a biased jury. I can't comment on why certain attorneys did or not do anything. I'm simply going by the record that was presented to me, the cases that have previously been published by this court and indicating that the court has a sua sponte duty to conduct that hearing. What else do you want to argue? The fifth argument deals with whether or not Judge Lawson in determining the amount of loss between $2.5 and $7 million considered evidence or considered information that was not a matter of record. In this government sentencing memorandum, there were a number of loans that $2.3 million or a little bit over, that no testimony was presented during the course of trial and defense counsel objected to. Then the court had a dialogue with Mr. Shiffman, who was co-counsel at the time, and there was some agreement that six particular loans were discussed during the course of the trial. However, in terms of the amount of loss that the particular financial institution incurred, there was no testimony during the course of the trial and Mr. Fishman did object to that. And are you saying that there has to be specific evidence with cross-examination during the course of the trial? Because the government submitted a chart that sort of detailed and tracked the loss, and at the sentencing stage, the burden of proof is a preponderance of the evidence, correct? I'm not saying that you have to have a trial with the rigors of the actual trial itself. There was no evidence. I'm saying, isn't this chart where the government detailed the loss and the judge relied on, isn't that sufficient evidence for this trial? Or why is it not? What I am indicating is that the cases that I cited both in my opening brief and my reply brief indicate that when defense counsel questions the accuracy or legitimacy of information, either in the pre-sentence report or in the government sentencing memorandum, that the court should conduct an evidentiary hearing and make findings of fact. And when Mr. Fishman objected both in his sentencing memorandum with Mr. Morgan and at the time of sentencing as to the amount of loss, it was incumbent upon Judge Lawson to conduct a hearing. And simply accepting allegations that are in a pre-sentence report or a government's memorandum when objections are interposed is not sufficient for purposes of the government satisfying its sentencing guidelines. Where do you derive your position that the court has to conduct a separate independent hearing on a discrete issue? There's an objection, there may be many objections, and the court will address those objections during the course of that hearing, rule on them, consider the evidence, and ultimately make a determination to accept or reject without having a separate hearing. Well, the cases that I cite in the briefs indicate that the court is required to engage in some type of proceeding to make those findings of fact, if in fact the defense objects. And wasn't there a sentencing hearing? Well, there was a sentencing proceeding, but in terms of Mr. Fishman is arguing as to, I believe it was $1.8 something million that Fifth Third Bank alleged was the amount of loss. Mr. Fishman indicated he didn't know who computed that amount, where it came from, or how it came from. So simply because the government included it in its sentencing memorandum, the probation department parroted it in its pre-sentence report, the cases indicate that simply because the government presents a piece of paper at the time of sentencing, if it is objected to by the defense, that the court go into it in greater depth. And I'm not about proof beyond a reasonable doubt, and I'm not talking about the formalities of a trial, but I am at least talking about the testimony should have been presented, that whoever on behalf of the financial institution had presented or prepared that chart and those figures should have been called in, should have been subject to examination and cross-examination, and the opportunity for Judge Lawson to make findings of fact as to whether or not that $1.8 and change is an accurate amount. The burden is upon the government because defense admittedly initially was arguing for an amount of loss between $400,000 and $1 million in its sentencing memorandum. At the time of the sentencing hearing, that was amended, that they were agreeing it was between $1 million and $2.5 million. The government was asking for $2.5 million to $7 million. The burden was on the government to show that amount, and if the defendant was questioning it, and there was no testimony at the time of trial as to the accuracy of that amount, it was incumbent upon the court to conduct a proceeding, and it's both cases from this Court of Appeals as well as other Court of Appeals that have indicated in my briefs, talk about the necessity to conduct a hearing and have findings of fact and not simply accept words around a piece of paper. Since you're quiet, I know that you're only focusing on these two issues, but does the fact that your client received a below-guideline sentence have any bearing on any of this? This Court has indicated that you first have to start off with the correct guideline calculation, and if the guideline calculation is incorrect, the appellate court has no way of knowing what the court would have done by way of sentence had it accurately calculated the guidelines. So it is error, and it should be remanded back on that issue. Thank you. Good morning. May it please the Court. My name is Amy Lee Copeland. I represent Ed Schneider. I've reserved two minutes today for rebuttal, and I'm going to focus on Mr. Schneider's three convictions because, frankly, those convictions trouble me. This is a case where the government presented a lot of direct evidence against Mr. Nizal. They presented the testimony of Eric Morton, the loan officer who talked about Nizal coming in with fraudulent financial documents, presented the testimony of these borrowers who would talk to Nizal and tell Nizal that their loan amounts couldn't be approved or they weren't making enough money, so Nizal would dummy those papers and present them to Morton. Ross Carey, who was a representative of a title company, came in and testified again that Nizal came in after the fact and procured title insurance that they backdated in this whole lien-jumping suit. Instead, against my client, the government presents circumstantial evidence. It's circumstantial evidence, for instance, like on the Wyoming property. There's a fill-in-the-blanks purchase agreement that my client apparently faxes from his office or somebody from his office faxes. If you look at this purchase agreement, it genuinely is. It's a form, and it doesn't seem that an attorney had any hand in this at all because, as I note in footnote 3 of my brief, it actually shows a seller and not a buyer paying earnest money. In that transaction, my client got $500 in legal fees. He prepared articles of incorporation and a second mortgage. Morton gets $3,500. All the conversations about this property occurred in Arabic. I think Sael El-Khattayt, who was the seller, testified, or Monif Ziyad, or testifies that they said hi to my client, but they then spoke to Nizal. But there were a lot in English that your client was present at. It's hard to believe that over these years where he was preparing documents and paying amounts out of his accounts that he had no understanding of what Nizal was doing. I mean, it just kind of stretches the imagination to believe that he was so stupid that he didn't know what was going on. The jury is the agency that we have in this country for deciding on circumstantial evidence problems, and they decided the case based on the inferences they made from the circumstances. Can we set that aside? You can, your honor. You're the stopgap measure. Why should we? In this case, it's a case a lot like Parks that this court decided. There was innocent conduct by Mr. Parks that the government attached an inference to. My client is, I guess, the victim of that inference here. You can infer intent in a fraud case, but you look for badges of fraud, for instance, efforts to conceal. The efforts to conceal here cited by the government are an affidavit signed by Morton and notarized by someone in my client's office. Not even by my client, but notarized by Donna Lynn Sovey. What about the $1,000 from the IOLTA account? The IOLTA account is a pretty significantly governed entity in an attorney's office. No doubt. And if you have any sense, you don't write money, you don't write checks out of your IOLTA account unless you're sure where they're going, because they're trusted money. So why wouldn't that have raised a flag for him? We aren't. Two things. Number one, whether Mr. Schneider is behaving ethically or in the best practices of an attorney isn't the issue in this case. Whether I think that that's... But if he's acting inappropriately in that or not governing or not meeting his own responsibilities under his duties on his IOLTA account, why can't a jury rightly determine that that's evidence of other impropriety as well? When you look at this case and the circumstances of that $1,000 check, Your Honor, that negates any argument to that effect. Morton testified about that check. He did receive it from Schneider in Schneider's office. Nassau directed Schneider to write a $1,000 check. Did Mr. Schneider also sign documents indicating that he had the role of treasurer of some of Mr. Nassau's companies, which would put him in an active participation role, but also certainly give the jury a basis for inferring knowledge about a lot of the activities that were going on within this scheme. May I finish, Judge James? Oh, I'm sorry. And I want to answer your question, too. Absolutely. But with the $1,000 check, Morton's testimony was, did Schneider know? Well, it was his testimony. And turning to yours, there are two letters the government contends were signed by Schneider as either a treasurer of Alter Investments or as G&S Development, which were Nassau's company. The $22,000 letter from Alter, no one could identify Schneider's signature on it. They were asked. Morton was asked. He said, well, the first name almost looks like Edward, this almost looks like the signature. Ahmaud Shiado several times has asked it, whose signature is this? I don't know. Whose signature is this? I don't know. Well, maybe it's, I don't know, is the continuing testimony. Was that in evidence? That is in evidence, Your Honor. It is the document? The document is in evidence. And did the jury have an opportunity to look at it? I'm certain that it did, Judge. Did they, was anything wrong with their drawing inferences from it? Your Honor, we don't know specifically what inference the jury drew. They don't tell us. They don't tell us that. They don't tell us that. But the testimonial evidence, no one could identify that that was Schneider's signature. The second document, the $549,000 payoff letter from G&S that apparently was signed by my client as treasurer of G&S, it was not actually the document that was used at closing. There actually was a substantial debt from the Mackeys to Hussain Nizal at this time. Mackey testified that the debt probably was as much as $500,000 and it was a $549,000 letter that my client wrote. But on both of these letters, I think it's interesting that both the letters the jury saw, it does say if you have any questions about this debt amount to contact Sam Nizal. It doesn't say contact Schneider. This kind of segues into, I'm sure, what the government will point out, is that when Mr. Schneider was questioned by authorities 30 to 45 minutes upon, I guess, an execution of a warrant or an arrest in this case, Mr. Schneider denied being any sort of officer or member of either G&S or Altered Developments. And they hold this out as a badge of concealment. I assume these arguments were made to the jury. Your Honor, many of them. The argument and the issue there was your client's intent. Right. Bottom line is, what did he know and what was his intent? And the proof was put on, most of it circumstantial against him, although there are these $1,000 check and potential signing, these other things. And then it was up to the jury to determine what his intent was. And, you know, you might have won the case in the district court if the jury had returned a different verdict. But certainly they had proof before them from which they could make this decision, right? Your Honor, I don't believe so. Given the type of evidence before it, you know, the liver noise agreement, he simply signs the purchase agreement as a witness. There are things whited out. Nobody knows who fills them in. Things are misspelled. Schneider gets no money from this. For the Van Dyke properties, he makes $3,800 in legal fees over two loans. When you look at the indicia fraud and the circumstantial evidence surrounding fraud, one of the things you look to is the profits. And my client is an attorney. And over three years, he made $5,388 in legal fees closing these loans. It just doesn't make sense that he would be participating in this. Nizal is getting a $950,000 personal guarantee torn up. Eric Morton is getting $20,000 from Nizal, mostly in $100 bills, mostly in cash. Meanwhile, my client's performing legal services and makes $5,388 over a three-year period in the course of various clothing. I think your time's up, counsel. Thank you. May it please the court. My name is Erin Shaw. I'm an assistant United States attorney from the Eastern District of Michigan, and I represent the United States. I'd like to begin by addressing Mr. Weiss's argument about potential jury bias. He claims that we did not have a Rummer hearing in the district court, and that that was a mistake. There was no reason to have a Rummer hearing because there was no evidence of any extraneous influence on any juror in the case. And that's what a Rummer hearing is for. That's the framework, and that just wasn't applicable in our case. And that's the reason why one wasn't requested and one wasn't done by Judge Lawson. It just didn't make sense. It wasn't the right thing to do. Mr. Weiss also indicated that it was unclear about who had issued the note, and it was not unclear at all. The pronoun I is used, and in discussions about that note, the court and Mr. Wishnow, who represented Mr. Schneider, said, we're going to address the note from juror number seven. It was very clear that it was a note from one juror in particular and not a community note, so to speak. There's also a suggestion that there was a fundamental bias, and there's a structural defect. There are other cases where jurors have been scared of the defendants, given the violent nature of different cases, and have indicated, does this defendant have an opportunity to know where I live? Things like that. That was the Ford case, and that did not rise to a level of bias or structural defect that would have required a mistrial or anything along those lines. So there is no evidence of bias in this case, and the methodology the court used by giving curative instructions that were agreed upon by all attorneys was the right thing to do. I want to move to the loss calculation argument. What evidence was presented as to the loss amount with respect to Mr. Nassau, and was there an evidentiary basis in the record for the ultimate chart that the government used to give the judge the basis for calculating the loss? Yes. The chart had three columns. There was the original amount, an offset amount, and then the final amount. The original amount was the loan amount, and that most certainly was in evidence because that was what the two-week trial was about. Every one of those numbers in that column was direct evidence from trial testimony. And there was direct evidence and an opportunity to cross-examine on those amounts during the course of the trial? That's absolutely right. And I don't think there was any dispute that those were not accurate amounts. If the mortgage was for $485,000, that was the amount. Then the government went to the bank and said, were there any offsets that should credit the defendant? Because that's the right thing to do. If they sold the property, the credit should go to the defendant. And then that happened. And they got a report back from the bank that went to the defense. They had an opportunity to look at it. And that's really what I think the issue is here. It's not that the original number was wrong, that the defense didn't like the offsets and thought they weren't robust enough. And that's when Judge Lawson said to them, well, what do you have? And they said, oh, we don't have anything, but it's the government's burden. And he said, well, no, if you have something else, you've got to bring it to me. And I can compare them. But if they bring me numbers from the bank with offset numbers and you say, I think they're too stingy, that's on you to bring me something else. And they didn't bring anything else. And the case is the Washington case where that defendant made the same argument. And they said, no, you've got to bring us something. And she did not. And in this... But even if the defense didn't bring anything to affect the offsets, was there an opportunity for the defense to question or examine somebody, whoever the originators of those offsets? There was no witness at the sentencing hearing. It was a two-hour sentencing hearing. It was both defendants. But it was a very long hearing and a very detailed hearing where all of these arguments were made in detail over an extended period of time. So there was an opportunity to cross-examine during the trial. Absolutely. And now I'm turning to Mr. Schneider's case. I want to back you up just a second. Oh, absolutely. Because you said there were three columns. And you told us about two on the chart. So what was the third? Oh, I'm sorry. There's the transaction, the loan amount, and the charge-off. So there's just the three. I apologize. Now moving on to Mr. Schneider. I have a practical concern about Mr. Schneider. Why in the world would an attorney risk his license and his freedom for $5,000 earned by doing some work over several years? How does that? Was there any other payment? Is there any other thing of value he got? What is the proof? And it looked to me like it was $5,200. Well, I think there's a couple of things there. I think Mr. Schneider worked with Mr. Nassau for a long time. And that was a very significant client for him. He was on record as treasurer of GNS Development. And that is really important, not for the reasons that Ms. Copeland says, because that was the payoff letter for that one transaction. That's not why I'm interested in that document. It shows that he has a vested interest in GNS Development as the treasurer of that corporation. And so anytime GNS is succeeding, ostensibly so is Mr. Schneider. You're absolutely right that he didn't get a lot of money out at the closings. And other people did, like Mr. Nassau put in the false payoff notes and he got more money. That is true. It doesn't actually make a lot of sense why someone would do this. But the fact is that he did it. And he did it over and over and over. Well, could there have been other money that was not in evidence in the case that Schneider made? There could have been. FBI didn't come up with everything, perhaps. I don't know. That's true. And also Mr. Nassau dealt with cash a lot, as we saw with Mr. Morton. Every payment was in cash except for that one special check from Mr. Schneider's IULTA account on the Hamilton transaction. The Parks case, I disagree with Ms. Copeland that that's on point here. That was where the attorney just sent a few faxes. And we have Mr. Schneider involved over and over and over. It wasn't one document got faxed. He was involved in Hamilton, paying the bribe to Mr. Morton. He was involved in Wyoming, present at these meetings. Sial El-Khattat did testify that Sam Asal was the translator and that anything that needed to be communicated, he translated into English so they could communicate with people who did not speak Arabic. On the Van Dyke transaction, on 9701 Van Dyke, Mr. Schneider put in a $22,000 false payoff letter to benefit alter investments. There's been argument that maybe that wasn't his signature or his name. But two witnesses said, it looks like Edward to me. There's only one Edward in the case. And it was faxed from Edward Schneider's law office into Mr. Morton for the transaction. So I think the inference that the jury made that that was him. Particularly where they were able to see his signature on multiple documents in the case, where he signed as a witness, or he signed a check, or he signed something else. They had an opportunity to take a look and see if they thought that that was his signature. And apparently they did because they convicted him. I don't have anything else really, unless there's more questions. No. Thank you. Thank you. Just briefly, in response to the government's argument that there was no indication of an extraneous influence on the jury. That's one of the insidious things when you don't have a hearing, because you don't know whether it's extraneous or it's intramural between the jurors. But as the Resco case that I said in my pride brief indicates, it's really the same analysis. And the jurors can't run rampant, even if there's no extraneous influence, and do whatever they want or have whatever feelings they want, without some type of readity or inquiry. A note from one juror, juror number seven. Well, without knowing whether or not the juror just woke up one morning and decided to do it on his or her own, or whether it was a collaborative effort, and that individual was the only one that wrote it, because again, there was no dialogue, there was no inquiry, so we're left to speculate. And that's why I believe a Remmer hearing would have alleviated whether it was just one isolated juror that maybe could have been removed, or whether it was endemic of the entire panel. We have no way of knowing. But the defense counsel didn't request a Remmer hearing, did they? I wasn't there, and I can't condone... But the record is there, and there's nothing in the record that suggests that that person asked for that. That's why... And there's nothing in there that shows that the defense counsel requested that that juror be excused and that an alternate be seated, correct? I would submit, respectfully so, that that's why previous panels of this court have indicated that it is the trial judge's sua sponte duty to conduct the inquiry and not counsel's. As it relates to some questions that you previously had in terms of the amount of loss, and also if I may respond to Judge Merritt, during the course of the trial, the issue was not the amount of loss. The issue was whether he was guilty or innocent. And unlike a drug case where Elaine would indicate that maybe an element is the quantity of drugs... You're always depending... You're always dependent, in a case of this kind, on what happened at the trial. The district judge has to make a judgment about that, based on a case like this, on what was proved in the case. I understand, but when it comes time for sentencing, and you've got facts that were not gone into at the time of trial, and Mr. Fishman is objecting... Not gone into, they were approved. The loans were discussed during the course of the trial, not the amount of loss. The judge used the chart of $1.8 million that was not referenced during the course of the trial. Mr. Fishman indicated... That was a reduction that benefited your client. If the loan was for $4 million and it became $1.8, it was because your client got credited with some payoff money. But the government was advocating a sentence predicated on the $1.8 million. Which is the reduced amount. And was incumbent upon them to show that it was the accurate amount when defense counsel objected. They could have just left it at the full amount of the loan, and increased the loss by that amount. A moment ago, we were complaining that defense counsel didn't do anything vis-a-vis the jury notes. Now that defense counsel is articulating objections at the time of sentencing, I would submit that the cases that I cite in the reply brief, as well as in my opening brief, indicate that the court should have conducted a hearing. And to answer your honor's question regarding the fact that there was a variance, this court, previous I believe in Young, which is cited in my brief, indicated that even though there's a variance, if the initial calculations weren't correct, then you remand back so the appropriate calculations are conducted to ascertain what the amount of the variance would have been at that juncture. Do you have another question? Thank you. Thank you. Just briefly, there's no proof in the record that Schneider got anything from G&S and Alter as a supposed corporate officer in this case. I'll note that he hatched CJA counsel both at trial and then on appeal. As for Mr. Nizal being a profitable and long-time client, the only other evidence of that at trial was a $1,200 invoice that agents found in Mr. Nizal's home at the search. I think it was on a seven-mile property that Mr. Schneider did something about. So if you want to up the ante to $7,000 over three years in legal fees, that simply doesn't explain why Mr. Schneider would have engaged in a massive fraud with Mr. Nizal, who benefited greatly. Thank you. I have no further argument unless y'all have any questions. We see, Ms. Copeland, that you are serving pursuant to CJA appointment, and we appreciate your service. Thank you, Judge.